UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　Plaintiff<br><br>v.<br><br>YARED RETTA,<br><br>　　　Defendant | 2:15-cr-00009-JAD-VCF<br><br>**Order Adopting in Part Report and Recommendation, Sustaining Objections, and Granting Motion to Suppress**<br><br>**[ECF 20, 45, 50]** |

　　　Patrol officers running license plates in a drugstore parking lot stumbled on a maroon Saturn driven by Yared Retta. They discovered the car was registered to Steven Ricks, who had outstanding traffic warrants and matched Retta's physical description. But when they attempted to make contact with Retta to investigate, he fled into an apartment across the parking lot. The officers gave chase, arrested Retta out of the residence, held him—un-Mirandized—at the scene for hours, and ultimately located a gun and some marijuana in the car. Retta, already a felon, was charged with illegal possession of the firearm.

　　　Retta moves to suppress the gun, the drugs, and his post-arrest statements, arguing that these items are the fruit of an illegal arrest and search.[1] After a two-day evidentiary hearing, Magistrate Judge Cam Ferenbach found that both the arrest and the search violated Retta's Fourth Amendment rights, but he recommends against suppression because the officers had probable cause to search the car based on information that bears no causal connection to the unlawful arrest.[2] Retta objects to the magistrate judge's ultimate decision not to suppress.[3]

　　　Having reviewed the objected-to portions of the report and recommendation *de novo*, I agree that the arrest and search were unconstitutional. But I do not agree that the police had probable

---

[1] ECF 20.

[2] ECF 45.

[3] ECF 50.

cause—independent of the fruits of the unlawful arrest—to save the evidence from suppression. I therefore sustain Retta's objections, grant Retta's motion to suppress, and adopt the report and recommendation to the extent that it is consistent with this order.

## Background

**A.     Retta's arrest**

In the early evening of December 26, 2014, Las Vegas Metropolitan Police Department ("Metro") officer K. Doty and his trainee,[4] Officer A. Salgado, were randomly running license-plate numbers in a Walgreens drugstore parking lot in a neighborhood that both officers testified was known for crime, particularly narcotics trafficking.[5] At around 5:30 p.m., a maroon Saturn pulled into the parking lot and lawfully parked in front of the store.[6] A black male, the Saturn's lone occupant, got out of the car and walked into the store.[7] The officers ran the Saturn's plates and discovered that the car was registered to Steven Ricks, a black male with outstanding misdemeanor traffic warrants.[8]

When the Saturn's driver exited the Walgreens a few minutes later, he did not return to the car; he continued past it toward a neighboring apartment complex.[9] Salgado emerged from the patrol car to conduct a stop to determine if the driver was, in fact, the registered owner;[10] Salgado identified himself as "Metro Police," and the driver started to run.[11] The officers did not suspect the man of

---

[4] Evidentiary Hearing, Day 1 at 11:41 a.m. (Doty). The evidentiary hearing was not transcribed. Accordingly, I reviewed all testimony using the audio recording, and all references to the hearing are to the audio recording.

[5] *Id*. at 10:15 (Salgado); 11:41 a.m., 11:49 a.m. (Doty).

[6] *Id.* at 10:15 a.m. (Salgado).

[7] *Id.* at 10:16 a.m. (Salgado).

[8] *Id.* at 10:16 a.m., 10:35 a.m. (Salgado).

[9] *Id*. at 10:17 a.m., 10:35–10:36 a.m. (Salgado).

[10] *Id.* at 10:18–10:19 a.m. (Salgado).

[11] *Id.* at 10:19 a.m. (Salgado).

any crime of violence or drugs or fear for their safety.[12]  Nevertheless, Doty, who was driving the patrol car, activated his lights and sirens, Salgado gave chase on foot, and Doty soon followed.[13]  The driver ran into the closest apartment and closed the door, despite Salgado's physical attempts to prevent the door from closing.[14]  Salgado pounded on the door while shouting "Metro Police open up!" and an unknown man opened the door.[15]  The officers could see the driver standing in the rear of the apartment, and they "ordered" him outside, warning that they "weren't going any where," and neither was he.[16]

The driver complied and came outside, where he was immediately handcuffed and patted down.[17]  No contraband was found on him, but he smelled of alcohol.[18]  In response to non-Mirandized questioning by the officers,[19] the driver identified himself as Yared Retta—not Steven Ricks—and he said he was scared because he had been drinking.[20]

A multiple-hour on-scene detention ensued.[21]  The officers escorted Retta back to the patrol

---

[12] Evidentiary Hearing, Day 1 at 10:34 a.m. (officer Salgado testifying that the officers did not suspect Retta of any theft crime or crime of violence).  The record is devoid of any indication that the officers feared for their safety.

[13] *Id*. at 10:19 a.m., 11:43 a.m.

[14] *Id.* at 10:20–10:21 a.m.; 10:36 a.m.

[15] *Id.* at 11:44 a.m.

[16] *Id.* at 10:20–10:21 a.m., 10:51 a.m., 11:44–11:46 a.m.  Salgado testified that this was not a "knock and talk."  *Id*. at 10:49 a.m.

[17] *Id.* at 11:18 a.m.

[18] *Id.* at 10:21 a.m.  The officers did not perform any standard field sobriety tests or breathalyze Retta.  *Id*. at 10:58 a.m.

[19] *Id*. at 10:53–10:54 a.m., 10:58 a.m.

[20] *Id*. at 10:22 a.m., 11:44–11:45 a.m.

[21] ECF 25-1 at 2–3.  Officer Salgado initially testified that, as soon as he ordered Retta out of the apartment, he placed him in handcuffs and "immediately arrested him" for obstruction of justice.  Evidentiary Hearing, Day 1 at 10:53, 10:55 a.m.  But Salgado ultimately recanted that testimony after further questioning, suggesting, alternatively, that he took Retta into custody because he had

car in the Walgreens parking lot where they ran a background check on him.[22] The background check revealed that Retta was on parole.[23] Doty then contacted Parole and Probation ("P & P"), which confirmed that Retta was a parolee, advised that alcohol consumption was a violation of his parole conditions, and instructed the officers to place Retta on hold for a parole violation.[24] P&P did not direct the officers to search Retta's vehicle.[25] Twenty-six minutes after the officers forced Retta out of the apartment and handcuffed him, they told him he was under arrest for violating his parole conditions.[26]

**B.     The search of the vehicle**

At the two-day evidentiary hearing, both officers testified that they did not smell marijuana on Retta's person or emanating from the Saturn, and neither officer testified that Retta appeared to be under the influence of drugs.[27] Nonetheless, both officers testified that they suspected there were drugs in the car based on Retta's evasive behavior and the fact that the drugstore was located in an area known for trafficking narcotics.[28] Because of these thin suspicions,[29] the officers requested a K-

---

fled, because this was a high-crime area, to control the situation, or because he was violating his parole by drinking alcohol. *See id.* at 11:11–11:12 a.m., 11:14 a.m., 11:18 a.m. When Doty called the event in to dispatch, he reported that Retta was being charged with obstruction. *Id.* at 2:01–2:02 p.m.

[22] *Id.* at 11:46–11:47 a.m.

[23] *Id.* at 11:46 a.m.

[24] *Id.* at 11:11–11:12 a.m., 11:47 a.m.

[25] *Id.* at 2:50 p.m.

[26] *Id.* at 11:13 a.m., 11:47 a.m.; ECF 25-1 at 2.

[27] Evidentiary Hearing, Day 1 at 10:56 a.m., 12:28 p.m.

[28] *Id.* at 11:48–11:49 a.m.

[29] Retta's Nevada State Parole Agreement contains a warrantless search clause, but the officers did not seek permission from probation to perform a search under this clause, nor did they perform the search at the direction of probation. ECF 26-1 (Parole Agreement); Evidentiary Hearing, Day 1 at 11:47 a.m.

9 drug unit; the dog sniffed the exterior of car and alerted to the presence of drugs.[30] A third officer who had been dispatched to the scene then asked Retta to sign a consent-to-search form to allow the officers to search the Saturn for marijuana.[31] After Retta signed, the officers asked him for the keys to the locked Saturn. Only then did the officers learn that Retta had disposed of the keys: Salgado testified that Retta told him that he "lost" the keys while he was running and did not know where they were,[32] while Doty testified that Retta indicated that he "might have" "thrown" or "ditched" the keys when he was running.[33]

Unable to gain entry to the Saturn, the officers called in a tow truck.[34] The tow-truck driver eventually arrived and jimmeyed the car open.[35] Salgado then searched the Saturn and found a gun and less than one gram of marijuana underneath the driver's seat.[36] Two firearms detectives were then dispatched to the scene; they requested and obtained a search warrant for the already-discovered items.[37] Retta then gave an incriminating recorded statement to the firearms detectives in which he admitted ownership of the gun. Retta was booked on one count of illegal firearm possession.[38]

**C.    Motion to suppress**

The indictment charges Retta with a single count of being a felon in possession of a firearm

---

[30] ECF 45 at 1.

[31] Evidentiary Hearing, Day 2 at 10:12 a.m.

[32] Evidentiary Hearing, Day 1 at 10:24 a.m.

[33] ECF 25 at 3; Evidentiary Hearing, Day 1 at 11:52 a.m.

[34] *Id*. at 11:53 a.m.

[35] *Id*. at 11:53 a.m., 11:04 a.m.

[36] ECF 45 at 1.

[37] Evidentiary Hearing, Day 1 at 11:06–11:07 a.m.; ECF 20-1 at 7–14 (telephonic warrant application).

[38] *Id*. at 11:19–11:20 a.m.

in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[39] Retta moves to suppress the gun.[40] He argues that the officers' conduct was unreasonable: the duration and scope of the officers' intrusion was disproportionate to the suspected offenses of operating a vehicle with outstanding misdemeanor traffic warrants and consuming alcohol in violation of a parole condition.

Magistrate Judge Ferenbach agreed. In a 12-page report and recommendation, he cataloged the law-enforcement comedy of errors that pervaded this investigation: officers chased—and arrested out of a home without a warrant or exigent circumstances—a man they believed to be a traffic misdemeanant.[41] They interrogated him without Mirandizing him.[42] Although they had zero evidence to suggest that there would be drugs in his car, the officers prolonged Retta's detention to call in a drug-sniff dog.[43] Retta's consent to the search was invalid because "Retta was in custody, not Mirandized, and not told that a search warrant could be obtained," plus he signed the consent form after dark while his hands were cuffed behind his back, and his name was not even entered in the blank on the form.[44] And, finally, the government lacked proof that the dog called to the scene had a reliable nose—in fact, Metro's records showed the dog was *not* properly certified.[45]

Magistrate Judge Ferenbach then found that: (1) the officers lacked probable cause to arrest Retta at the apartment, (2) the scope and duration of the search was unreasonable in light of the offenses the officers purported to investigate (obstructing a misdemeanor-traffic-warrant investigation and parolee intoxication), (3) the government failed to show that Retta's consent to the search was voluntary, (4) the dog alert did not give the officers probable cause for the search

---

[39] ECF 1.

[40] ECF 20. The government opposed the motion, ECF 25, and Retta filed a reply. ECF 28.

[41] ECF 45 at 4–6.

[42] *Id*. at 1.

[43] *Id*. at 6–7.

[44] *Id*. at 8.

[45] *Id*. at 8–9 & n.1.

"because the officers' purported basis for the dog sniff was insufficient" and the government failed to show the sniff was reliable, and (5) the firearms detectives' search warrant was invalid under *Franks v. Delaware* because it "predicated probable cause on the dog sniff and the officers' suspicion that Mr. Retta may have violated his parole conditions by drinking."[46] The magistrate judge nonetheless recommends against suppression because he believes the officers had an objectively reasonable basis to search the car at the time they jimmeyed it open: (1) Retta was a parolee (2) who fled from police and (3) discarded the car keys.[47]

Retta objects, challenging Magistrate Judge Ferenbach's conclusion that the officers had probable cause for a warrantless search of the car.[48] Retta points out that the officers learned that he had discarded the keys and that he was a three-time-convicted felon who had potentially violated his parole conditions only *after* they illegally arrested him.[49] Thus, he argues, this information is the fruit of that illegal arrest and must be excluded from the probable-cause analysis. The government—which filed no objections to the R&R—responds that there was no illegal arrest and, even if there were, the search of the car was lawful because the facts to support it were sufficiently attenuated from the arrest.[50]

## Discussion

### A. Standards of review

A district court reviews objections to a magistrate judge's proposed findings and recommendations *de novo*.[51] "The district judge may accept, reject, or modify the recommendation,

---

[46] *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978); ECF 45 at 5–9.

[47] *See* ECF 45 at 2.

[48] ECF 50 at 8.

[49] *Id.* at 8.

[50] ECF 55 at 3.

[51] *Id.*

receive further evidence, or resubmit the matter to the magistrate judge with instructions."[52] The standard of review applied to the unobjected-to portions of the report and recommendation is left to the district judge's discretion.[53] Local Rule IB 3-2(b) requires *de novo* consideration of specific objections only.[54] A district judge may not reject a magistrate judge's credibility determination that affects the rights of a criminal defendant without holding a new evidentiary hearing.[55] Otherwise, no further hearing is required.

Retta objects to Magistrate Judge Ferenbach's finding that the officers had probable cause to search the Saturn without a warrant and his conclusion that the exclusionary rule should not be applied to suppress the gun.[56] I review these facts and conclusions *de novo*. I accept and adopt the rest of Judge Ferenbach's findings and conclusions without review, and I discuss them here only as they relate to Retta's objections.

**B.   The officers lacked probable cause to conduct a warrantless search of Retta's car, and no exception to the warrant requirement applies.**

Retta's objection challenges the magistrate judge's final recommendation that the fruits of the search should be saved from the preclusive effects of the exclusionary rule because the officers had probable cause to search based on their knowledge that Retta was a parolee who fled from them in a high-crime area and discarded the car keys. He argues that two of these facts are the fruits of his unlawful arrest, so they cannot figure into the probable-cause analysis; without these two facts, the officers had reasonable suspicion at best.

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an

---

[52] *Id.*

[53] *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121–22 (9th Cir. 2003) (a "district judge must review the magistrate judge's findings and recommendations *de novo if objection is made*, but not otherwise.") (emphasis in original).

[54] *See* Nevada L.R. IB 3-2(b) (requiring *de novo* consideration of specific objections only).

[55] *See Johnson v. Finn*, 665 F.3d 1063, 1074–75 (9th Cir. 2011) (citing *Louis v. Blackburn*, 630 F.2d 1110 (5th Cir. 1980)).

[56] ECF 50 at 5, 8.

illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"[57] Of course, not every unlawful arrest renders a subsequent search unlawful; if the evidence is sufficiently attenuated from the unlawful arrest, the taint may have dissipated.[58] The Supreme Court has established a three-part test to determine if evidence is sufficiently attenuated from an illegal arrest to permit its consideration in the probable-cause analysis. The court considers: (1) the time elapsed between the constitutional violation and the acquisition of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct.[59] The burden of demonstrating attenuation falls on the government.[60]

**1. The officers' knowledge of Retta's parolee status and belief he had discarded the car keys were fruits of the illegal arrest.**

Twenty-six minutes passed between the illegal arrest and the officers' discovery that Retta was on parole and was violating a condition of his parole by drinking alcohol.[61] He was cuffed and in custody. And, although Retta smelled of alcohol when initially apprehended, he only verbally confirmed to the officers that he had been drinking alcohol during his post-arrest conversation with them.[62] There were no intervening circumstances between the arrest and the officers' discovery that Retta was, in fact, on parole that sufficiently attenuated this knowledge of his parolee status from the

---

[57] *United States v. Pulliam*, 405 F.3d 782, 785 (9th Cir. 2005) (internal citations omitted) (alterations in original).

[58] *See, e.g., I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1040–41 (1984) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)) (explaining, "The general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated.").

[59] *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).

[60] *Id.*

[61] Evidentiary Hearing, Day 1 at 11:13, 11:19 a.m. ("Q: So he's out there in handcuffs for about 30 minutes until you confirm that he's on parole with conditions? A: Yes."), 11:45, 11:47 a.m.

[62] *Id.* at 10:22–23 a.m., 10:54 a.m.

arrest.

The purpose and flagrancy of the officers' misconduct also militates against attenuation. "To assess the reasonableness of th[e] [police] conduct, [courts] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[63] "Searches and seizures inside a home without a warrant are presumptively unreasonable" in the absence of exigency or emergency.[64] "The 'emergency' exception stems from the police officers' 'community caretaking function' and allows them 'to respond to emergency situations' that threaten life or limb; this exception does 'not derive from police officers' function as criminal investigators.'"[65] "The 'exigency' exception . . . allows [officers] 'to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is 'necessary to prevent the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.'"[66]

There was no emergency or exigency here. When they chased Retta into the apartment, the officers believed he was obstructing their investigation into whether he was Ricks and had failed to pay misdemeanor traffic tickets. The record is devoid of any evidence that the officers (1) feared for their safety or that of the occupants of the apartment, (2) had any reason to believe that Retta lacked permission to be inside that residence, or (3) suspected Retta was holding any evidence that might be destroyed. In short, the level of Fourth Amendment intrusion here was not justified by the minimal government interest these officers were pursuing.

This is even more true for the officers' knowledge that Retta had discarded the keys during his retreat into the apartment. Officers did not learn the fate of the keys until after they'd arrested

---

[63] *United States v. Jacobsen*, 466 U.S. 109, 125 (1984).

[64] *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (quoting *United States v. Martinez*, 406 F.3d 1160, 1163 (9th Cir. 2005)).

[65] *Hopkins*, 573 F.3d at 763 (quoting *United States v. Cervantes*, 219 F.3d 882, 889 (9th Cir. 2000)).

[66] *Id*. (quoting *United States .v McConney*, 728 F.2d 1196, 1199 (9th Cir. 1984)).

Retta, called in the K-9 drug unit to conduct a dog sniff of the car's exterior, watched the dog positively alert for drugs, and then (sloppily) obtained his invalid consent to search its interior. It was in response to the officers' request that he provide the keys to allow their entry into the car—and still without *Miranda* warnings—that Retta told the officers that he must have "lost" or "ditched" the keys while he was running.[67]

The intervening circumstances between the unlawful arrest and the officers' acquisition of this evidence served to compound, not purge, the taint here. Had Retta not been arrested, had the officers not kept him on the scene to conduct a dog sniff,[68] had they not obtained Retta's invalid consent, and had they read him his *Miranda* rights, it is unlikely that Retta would have told the officers that he disposed of the keys. Thus, this fact, too, was the product of the unlawful arrest and, like Retta's parolee status, it must be excluded from the probable-cause determination.[69]

### 2. The remaining facts do not establish probable cause for the search or an exception to the warrant requirement.

When Retta's parolee status and discarding of the keys are excluded, the remaining facts known to the officers do not support probable cause. I am left with the fact that Retta was suspected of being a traffic misdemeanant who had let his tickets go to warrant and, when approached by the police, he fled into a nearby apartment in an area known to these officers as a high-crime area. These facts do not establish probable cause to believe that Retta's car contained contraband or evidence of a crime.[70]

Probable cause exists if, based on the totality of the circumstances known to the officers at

---

[67] ECF 45 at 8. I agree with Judge Ferenbach that the government failed to prove that Retta's consent was voluntary, both because of the circumstances surrounding the consent and the consent form's incompleteness: "I ____ having been informed of my right not to have a search made . . . ."

[68] *Cf. Rodriguez v. United States*, 135 S. Ct. 1609 (2015).

[69] *Wong Sun*, 371 U.S. at 488.

[70] *Carroll v. United States*, 267 U.S. 132, 153 (1925).

the time of the search,[71] there is a "fair probability that contraband or evidence of a crime will be found in a particular place."[72]  In *Illiniois v. Wardlow*, the United States Supreme Court evaluated the effect of unprovoked, headlong flight in an area known for drug trafficking.  The court recognized that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion," but "[i]t is not necessarily indicative of wrongdoing," just "suggestive" of wrongdoing.[73]  Thus, the court concluded, these facts support only reasonable suspicion,[74] which is "a less demanding standard than probable cause."[75]

Retta's headlong flight from the Walgreens parking lot[76] may have given the officers reasonable suspicion to conduct an investigatory stop of him under Fourth Amendment jurisprudence, but this nervous, evasive behavior could not *also* have given the officers probable

---

[71] *United States v. Elliot*, 322 F.3d 710, 715 (9th Cir. 2003) (stating that the probable-cause determination is "[b]ased upon the totality of the circumstances known to the officers at the time of the search.").

[72] *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

[73] *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000); *United States v. Smith*, 633 F.3d 889, 893–94 (9th Cir. 2011) (holding that flight in a high-crime area gives rise to reasonable suspicion to justify an investigatory stop).

[74] *Wardlow*, 528 U.S. at 125–26.

[75] *Alabama v. White*, 496 U.S. 325, 330 (1990) (explaining that "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.").

[76] I assume but do not decide that the officers' characterization of this area as a "high-crime" one is factually accurate.  The Ninth Circuit, sitting *en banc*, has warned that "the citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity.'" *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000).  Officer Doty and his field trainee, Officer Salgado, painted this area with a broad brush by baldly characterizing it as one known for a "high propensity of crime," violence, gang crimes, and narcotic traffic.  Evidentiary Hearing, Day 1 at 11:14 a.m., 11:41 a.m., 11:49 a.m.  The government offered no evidence to corroborate the officers' impressions, except for Officer Doty's testimony that there had been a recent stabbing in the area. *Id.* at 11:41 a.m.

cause to search the car.  What contraband or evidence did they expect to find in the car based on these facts?  Wadded up traffic tickets?

Calling the flight "obstruction of justice"—a misdemeanor under Nevada state law—cannot bootstrap these circumstances to probable cause.[77]  Nor does it change the sum of the equation to add in the officers' belief, based on their training and experience, that Retta's effort to distance himself from the vehicle suggested there was something illegal in there;[78] this just double counts the flight (which lasted less than a minute in total[79]) as two acts of evasion.

The government's argument that "there existed an additional reason for a warrantless search that was not addressed by the Magistrate Judge but which was nevertheless conceded by the Defendant and is apparently undisputed: 'Retta told the police that there was some marijuana in the car,'"[80] also fails to infuse the search with the probable cause it needed.  Retta's admission came about an hour into his on-scene detention and after he learned that the dog had positively alerted for the presence of drugs in the car,[81] so this statement was yet one more fruit of the illegal arrest.[82]

And finally, the government's disagreement with the magistrate judge's conclusion that the

---

[77] *See United States v. Williams*, 82 F. Supp. 3d 1183, 1188 (D. Nev. 2015) (declining to interpret Nevada's statute as giving officers probable cause to arrest an individual for obstruction based solely on flight because to do so would undermine Ninth Circuit authority holding that headlong flight from police only creates reasonable suspicion); *see also Lawson v. Kolender*, 658 F.2d 1362, 1366 (9th Cir. 1981) (invalidating state law requiring persons to provide reliable identification to the police or face arrest because the "the statute[] boostrap[ped] the authority to arrest on less than probable cause.").

[78] Evidentiary Hearing, Day 1 at 11:48 a.m.

[79] *Id*. at 10:44 a.m.

[80] ECF 55 at 3.

[81] Evidentiary Hearing, Day 1 at 11:01, 11:52 a.m.

[82] *See supra* at p. 9–11.  The government's bald assertion that "there was no illegal arrest here," ECF 55 at 3, is unpersuasive and was not raised as a timely objection to the magistrate judge's report and recommendation.

firearms detectives' search warrant was invalid[83] similarly fails to save the fruits of the search from exclusion. The government offered no timely objection to this finding. Even if I were to consider its merits, it fails. The search warrant application erroneously recites that it was "Officer Penetta," not "Officer Salgado" who was with Officer Doty that day.[84] And it included the facts that Retta was a three-time convicted felon on parole; the dog alerted for drugs; after having a tow-truck driver jimmy open the Saturn's door, officers found a gun and "a bag of unknown narcotics" under the driver's seat; and, after that, Retta confessed that the gun was his.[85] But for the illegal arrest and warrantless search, these facts would not have been known to the officers, so these facts should have been excluded from the probable-cause analysis. Without them, it is unlikely that the issuing judge would have found probable cause for the search.

In sum, the officers lacked probable cause to search Retta's vehicle, and the fruits of that search are not saved from exclusion by any exception. This case—fraught with disproportionate responses and constitutional errors at so many steps of the investigation—is precisely the type of case for which the exclusionary rule was designed.[86] The government did not meet its "burden of proving that [this] warrantless search [and] seizure [fell] within an exception to the warrant requirement."[87] Accordingly, Retta's motion to suppress is granted.

---

[83] ECF 55 at 4.

[84] ECF 20-1 at 8–9.

[85] *Id*. at 9.

[86] *See United States v. Leon*, 468 U.S. 897, 908 (1984) (cautioning against the "[i]ndiscriminate application of the exclusionary rule").

[87] *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012).

**Conclusion**

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion to Suppress **[ECF 20] is GRANTED.**

Defendant's Objections to the Magistrate Judge's Report and Recommendation **[ECF 50]** are **SUSTAINED**.

The Magistrate Judge's Report and Recommendation **[ECF 45]** is **ADOPTED** to the extent it is consistent with this order.

Dated this 29th day of December, 2015

_____
Jennifer A. Dorsey
United States District Judge